**Ola VORSTER, individually and on behalf of a class of persons similarly situated, Plaintiff,**

**v.**

**Otis R. BOWEN, Secretary of Health and Human Services, and Transamerica Occidental Life, Defendants.**

**No. CV 84–9700–ER(Kx).**

United States District Court, C.D. California.

Jan. 19, 1989.

Sally Hart Wilson, Michael C. Parks, Medicare Advocacy Project, Los Angeles, Cal., for plaintiff.

Ian Fan, Asst. U.S. Atty., Los Angeles, Cal., for defendants.

### ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

RAFEEDIE, District Judge.

### INTRODUCTION

On January 26, 1987, named plaintiff Ola Vorster ("Vorster") and class plaintiffs' motion for summary judgment and defendants Otis R. Bowen ("Secretary") and Transamerica Occidental Life's ("Transamerica") cross-motion for summary judgment came on for hearing before United States District Judge Edward Rafeedie. Sally Hart Wilson of the Medicare Advocacy Project appeared on behalf of the plaintiffs, and Assistant United States Attorney Ian Fan appeared for defendants.

Having carefully reviewed the papers and pleadings on file, including the notice of new authority filed by defendants on July 10, 1987, and plaintiffs' reply to notice of new authority filed July 15, 1987, the argument of counsel at hearing, and the governing law, the Court hereby makes the following determinations: (1) the Court has jurisdiction to consider both plaintiffs' constitutional and statutory challenges to the use of utilization screens by Transamerica and the adequacy of the notice sent to beneficiaries following the review determination level; (2) Transamerica's use of frequency of service utilization screens in processing claims under Part B of Medicare does not violate the Medicare statute; (3) The review determination notices must be revised to contain language that a frequency of service was exceeded, and that the beneficiary must supply additional information from their physician to demonstrate that the service was medically necessary; and (4) the Secretary appears to have satisfactorily implemented the settlement agreement.

### STATEMENT OF FACTS

#### A. PARTIES

1. Named plaintiff: Ola Vorster;

2. Class plaintiffs: All persons who, within the six-year period preceding the filing of this lawsuit, had Medicare claims that were denied by Transamerica Occidental Life at both the initial and review stages, and received review determination notices;

3. Sub-class plaintiffs: All persons included in the preceding class whose claims were denied as not reasonable and neces-

sary based on utilization screens applied by Transamerica Occidental Life;

4. Defendant: Otis R. Bowen, Secretary of Health and Human Services; and

5. Defendant: Transamerica Occidental Life (hereinafter, Transamerica).

## B. FACTUAL BACKGROUND [1]

a. The claims in this case all arise under Part B of the Medicare program, 42 U.S.C. § 1395j *et seq.* Medicare Part B establishes a voluntary and federally-subsidized program of supplemental medical insurance for persons who are 65 or older, or disabled. In general, Part B covers eighty per cent of the Medicare rate, called the "reasonable charge" for certain physician services, out-patient physical therapy, x-rays, laboratory testing and similar ancillary medical services. The "reasonable charge" is computed according to a statutory formula that is usually lower than the actual charge. Reimbursement under Part B is limited to services that are "medically necessary."

b. The Part B program is administered by private insurance carriers pursuant to contracts entered into with the Secretary of the Department of Health & Human Services ("DHHS"). Transamerica is the carrier which services the Part B program for Southern California. Transamerica is required to make determinations of the rates and amounts of payments required pursuant to Part B to be made to providers of services and other persons on a reasonable cost or other reasonable charge basis. It must also assure that payment is made only for services that are: (1) rendered to Medicare beneficiaries; (2) covered by Part B; and (3) medically necessary.

c. The claims review process is dictated by statute and regulation. Transamerica first makes an "initial determination" as to payment. Beneficiaries are notified of the initial determination in an Explanation of Medicare Benefits form ("EOMB") which is forwarded to the beneficiary along with any payment. The Medicare beneficiary (or the physician if the beneficiary has "assigned" the claim), if dissatisfied with the initial determination, may request review by the carrier. That review must be conducted by a claims reviewer who was not involved in making the initial determination. Additional information may be submitted, but in many cases is not. The decision rendered at this point by the independent reviewer is called the "review determination."

d. The review determination decision is based upon the available information. If the beneficiary (or physician) is dissatisfied with the review determination decision, *and* the amount in controversy is $100 or more, a hearing may be requested. A "hearing officer" not previously involved with the claim is designated by the carrier to conduct a hearing. Witnesses can testify and documentary evidence may be introduced, and as soon as practicable after the close of the hearing, the hearing officer issues a decision.

e. In 1983, named plaintiff Ola Vorster received 17 chiropractic treatments of manual manipulation for a subluxation of the spine, a covered Medicare service. Plaintiff Vorster submitted the chiropractic bills, totaling $612.25 to Transamerica. In an EOMB dated February 21, 1984, Transamerica denied entirely Vorster's claims for the chiropractic visits based on application of a utilization screen. The February 21, 1984 EOMB listed each service being denied coverage; noted the particular date on which the service was rendered; indicated the amount on the corresponding bill submitted by Vorster or her chiropractor for each claim denied; and indicated separately for each claim denied (through the use of asterisks with reference to footnotes), that the reason was either that "Medicare does not pay for this service by a chiropractor" or that "the frequency of this service is not covered." It did not

---

**1.** The facts stated in this opinion have been admitted by the parties in the Pretrial Conference Order lodged on October 2, 1986. The facts are set forth in the identical order and format as they appear in the Pretrial Conference Order.

mention the application of a utilization screen.

f. Vorster thereafter submitted a letter by her chiropractor in April 1984 in support of the claim. The letter explained why the chiropractor believed her treatments were medically necessary, and explained his reasons why x-rays were not taken in support of the treatment of the subluxations of the spine. In May 1984, Transamerica issued a review determination decision denying all claims. This notice listed the four criteria for coverage of chiropractic services and advised Vorster of her right to seek an oral hearing at which additional evidence might be submitted. It did not refer to the application of a utilization screen.

g. While the oral hearing was pending, Vorster filed the instant suit, claiming that the review determination notice was constitutionally infirm, and further claiming that Transamerica had improperly relied on utilization screens in denying Vorster's individual claim in violation of the Medicare Act.

h. After suit was filed, defendants provided Vorster with a more elaborate explanation to aid her in her preparation for an oral hearing. Vorster's hearing before a Transamerica hearing officer was held on March 27, 1985, and Vorster presented additional evidence and post-hearing submissions. The hearing officer subsequently denied the claims on October 8, 1985. Plaintiff Vorster's request for rehearing her request was denied.

i. On July 22, 1985, this Court certified a class in this action defined as all persons who, within the six-year period preceding the filing of this lawsuit, had Medicare claims denied at both the initial and review determination stages, and received review determination decisions. Within this class is a sub-class of all persons whose claims were denied as not reasonable and necessary based on utilization screens applied by Transamerica.

j. Thereafter, by Stipulation entered on November 8, 1985, the parties agreed to resolve certain claims challenging the adequacy of the review determination decisions. Subsequently, plaintiffs notified the Secretary that the manual provisions implementing the stipulation did not effectuate the stipulation. The Secretary contends the changes he made in the Carriers' Manual do effectuate the stipulation. The Court agrees.

k. Utilization screens are devices which permit the computer system to perform several types of comparisons, including the comparison of frequency to time. The utilization screens set numerical parameters for certain procedures or visits based on a calendar month, quarter, and year, and in the case of the frequency to time comparison are used as a screening device to decide whether further review is necessary to make a determination if the services were covered by Medicare. In general, the utilization screens reflect Transamerica's and the Health Care Financing Administration's ("HCFA") judgment as to the threshold where further review is required to determine whether services are reasonable and medically necessary. The result of the application of the screen is denial of claims that exceed the parameter unless additional information is available that justifies the medical necessity of the services.

l. Use of utilization screens by carriers such as Transamerica is required by the HCFA, which is that part of the DHHS which administers the Medicare program. In 1977, HCFA required carriers to develop utilization screens generally to assist them in deciding whether services were covered, but did not dictate which procedures were to be used and what parameters were to be set. As a result, Transamerica internally developed its own utilization screens, which today total approximately 125 in number.

m. In 1982 Congress mandated that the Medicare agency increase its utilization control efforts. As a result, HCFA has increased emphasis on the use of utilization screens for medical necessity review. Carriers, including Transamerica, have been required to file with

HCFA various reports which capture the cost-effectiveness of their individual utilization screens and their utilization programs over-all in terms of benefit payment denials or reductions, *i.e.*, the cost effectiveness of the process in catching claims that otherwise would be paid improperly. Included in these reports is a cost-benefit ratio calculation for prepayment utilization review. The ratio is derived from the accumulation of all costs attributable to the utilization review versus the amount of benefit dollars denied as a result. In light of congressional direction, HCFA considers a minimum 1:5 cost-benefit ratio for carrier prepayment utilization review acceptable. Since 1983 Transamerica has consistently exceeded HCFA's 1:5 cost-benefit goal for prepayment utilization review by a substantial margin. In 1985, Transamerica's annual ratio for this function was 1:16.59, and its net savings of believed improper program payments based on beneficiary payment denials or reductions as a result of review triggered by utilization screens totaled $27,052,222.60.

n. In October 1984, HCFA for the first time required that carriers set specific HCFA-dictated parameters, which mandate further review for certain enumerated procedures. The so-called "HCFA-mandated screens" today total sixteen in number. HCFA monitors the application of the mandated screens but does not monitor the content or application of the Transamerica screens.

o. When a claim is received at Transamerica, it is sent to a level one claims examiner, who enters the information on the claim into the computer. Claims which contain the required information and which do not exceed the utilization screen parameter for the particular covered service or procedure in question are automatically paid by the computer. However, if the parameter has been exceeded, the claim "suspends" from the computer and is sent to a level two claims examiner.

p. The level two claims examiner in turn reexamines the "suspended" claim. At such time, the level two claims examiner has a copy of the beneficiary's computer profile which goes back at least three years in time, and which shows all the services which were rendered to that beneficiary. The level two claims examiner initially determines if the level one examiner correctly processed the claim. If the claim was initially "suspended" because the utilization parameter was exceeded, the level two claims examiner refers to the manual instructions accompanying the utilization screen and to the profile to determine the medical provider's pattern of billing or pattern of service. The diagnosis is reviewed if it is available. If additional information has been provided, such information is also reviewed. Medicare beneficiaries are not instructed to submit supporting information with their medical bills at the initial claim and do not usually do so. The level two claims examiner then makes an independent decision as to payment based upon the information before.

q. In the event the level two claims examiner is unable to make a decision, the claim may be sent to medical advisors for consultation. One Transamerica examiner sends approximately 10–20% of suspended claims to the Medical Records Utilization Review department.

r. In any event, when a decision has been made at this initial determination stage, an EOMB is sent out informing the beneficiary of the decision on the claim. Utilization screens are not mentioned on the EOMB's. If the beneficiary is dissatisfied, he or she may seek further review at the review determination stage. For Fiscal Year 1984, 85,314 claims were denied by Transamerica based on the use of utilization screens. Of these, 45,491 requests for review were received by Transamerica.

s. At this latter stage, a reviewer has complete authority to pay or affirm the original decision. The screens are used as guides at this level to assist the reviewer in deciding whether the frequency of services exceeds the acceptable medical standards in the community. The utilization screen is the point at which

medical necessity stops and overutilization begins in the absence of unusual circumstances. In the absence of additional information or a clerical error, the claim continues to be denied. At the initial determination stage, a reviewer may obtain the assistance of a medical consultant. The entire Medical Review Department receives requests for such medical input approximately 20–30 times per week.

t. The decision at the review determination stage is sent to the beneficiary in the form of a letter. In the case of a decision denying a claim based upon overutilization of services, the letter will reflect that the claim had been denied for overutilization, but will not mention the use of a utilization screen in the process. The letter will also inform the beneficiary of the right to request a hearing within six months of the date of the letter, and the way in which such a hearing can be requested.

## DISCUSSION OF LAW

### I. JURISDICTION

■ For the third time in the course of this litigation, the defendants are challenging the Court's jurisdiction. In the prior summary judgment motion, defendants conceded and this Court held that the Court had jurisdiction to hear plaintiff's statutory and constitutional claims as a result of the Supreme Court's decision in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986). In *Michigan Academy*, the court held that Congress had not barred judicial review of statutory challenges to regulations promulgated under Part B of the Medicare program. The court reaffirmed the strong presumption that judicial review is intended by Congress in the absence of specific language and express legislative history stating otherwise. 476 U.S. at 670–73, 106 S.Ct. at 2135–37. The court stated that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Id.* at 671, 106 S.Ct. at

2136 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)).

Defendants now argue that § 9341 of the Omnibus Budget Reconciliation Act of 1986, Pub.L. 99–509, overcomes the presumption of reviewability relied on by the court in *Michigan Academy*. Pursuant to this provision, Congress amended 42 U.S.C. § 1395ff to establish a limited right to judicial review of Medicare Part B claims determinations. To be eligible for review by an Administrative Law Judge (ALJ), the amount in controversy must be $500 or more. Judicial review is limited to cases involving $1,000 or more.

In addition to the above amendment to § 1395ff(b), Congress added the following paragraph:

(4) A regulation or instruction which relates to a method for determining the amount of payment under Part B and which was initially issued before January 1, 1981, shall not be subject to judicial review.

The testimony shows that in 1977, HCFA required carriers to develop utilization screens, but did not dictate what parameters were to be set. Therefore, defendants argue that screens are a methodology established by policy instruction prior to January 1, 1981, and that plaintiffs' statutory challenge lacks jurisdiction.

The essence of plaintiffs' opposition to this jurisdictional challenge is that the language and legislative history do not provide clear and convincing evidence to overcome the strong presumption of judicial review.

First, plaintiffs submit that "amount of payment methodologies" has a specific meaning well-known to Congress which is separate and apart from utilization review. For support, plaintiffs point out that amount of payment methodologies are prescribed by Congress in the Medicare Statute at 42 U.S.C. § 1395*l* and § 1395u, and that neither section mentions utilization review.[2] Moreover, as part of the Omnibus

**2.** § 1395*l* discusses calculation of the amount of

benefits in general and for some specific items

Budget Reconciliation Act of 1985, P.L. 99–272, Congress established a special commission to consider "changes in the methodology for determining the rates of payment." In this section, Congress directs the commission to consider many factors with respect to payment amounts for physician services and to make recommendations about changes in the payment system for physician services. However, the commission is nowhere directed to advise DHHS respecting utilization review.

Second, plaintiffs argue that even if the new legislation is applicable to utilization screens, plaintiffs are not, as defendants contend, challenging regulations or instructions issued before January 1, 1981. Plaintiffs are not challenging the substance of one regulation or instruction. Rather, they are challenging a process of using utilization screens that has developed over time. Although one "instruction" was issued before 1981, (i.e., the 1977 instruction to carriers to develop utilization screens), plaintiffs allege that the further HCFA instruction issued in 1982, and the HCFA screens issued in 1984 also have contributed to the wrongful use of screens by Transamerica. Since it is not clear that the whole methodology being challenged here was *established by the Secretary* before 1981, the doubt should be resolved in favor of reviewability.

Plaintiffs' arguments are well taken. It seems that utilization review is a distinct matter from methods for determining the *amount* of payment. Also, it is not clear that this action is limited to challenging a regulation or instruction issued before January 1, 1981. Since there is a doubt as to whether Congress specifically intended to foreclose judicial review on the issue of whether certain methods of utilization screening violate the statute, the doubts should be resolved in favor of judicial review.

## II. TRANSAMERICA'S USE OF FREQUENCY OF SERVICE UTILIZATION SCREENS IN PROCESSING CLAIMS UNDER PART B OF MEDICARE DOES NOT VIOLATE THE MEDICARE STATUTE

■ The Medicare Act and legislative history support the use of utilization screens in processing claims under Part B of Medicare. The Medicare Act requires that Part B payments of covered items or services may only be made where such items or services are "medically necessary." 42 U.S.C. § 1395y(a)(1)(A).[3] Congress instructed the Secretary to use the expertise of private sector carriers in administering the Part B plan, and has acknowledged that the efficient administration of the Part B program includes review of utilization and control of unnecessary utilization of covered services:

The House-passed bill requires the Secretary, to the extent possible, to enter into contracts with carriers under which the carriers would perform specified administrative functions ... These functions include: ... determining whether providers meet the utilization review requirements under the program; assisting providers and other persons to develop procedures relating to utilization practices, and studying the effectiveness of such procedures; assisting in the application of safeguards against unnecessary utilization of covered services ...

S.Rep. No. 404, Part I, 89th Cong., 1st Sess. 5 (1965), U.S.Code Cong. & Admin. News pp. 1943, 1993.

---

such as mental disorders and physical therapy services. That section also discusses deductions, nonduplication of payments, and accrual of interest on excess of deficits not paid. § 1395u concerns use of carriers for administration of benefits and discusses, among other things, contractual duties between HHS and the carriers with respect to payment of benefits, and the determination of "reasonable charge" and "customary charge." Neither section mentions utilization review.

**3.** § 1395y(a)(1)(A) provides as follows:

Notwithstanding any other provision of this title ... no payment may be made under ... Part B ... for any expenses incurred for items or services—(1)(A) which ... are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

In 1972, Congress approved the application of utilization screens as a means to deal with professional standards review of medical necessity under the Act:

> The new review organizations would be large enough to take full advantage of rapidly evolving computer technology ... The review process would be made more sophisticated through the use of professionally developed regional norms of diagnosis and care as guidelines for review activities, as opposed to the present usage of arbitrarily determined checkpoints. The present review process, without such norms, becomes a long series of episodic case-by-case analysis on a subjective basis which fail to take into account on a systematic fashion the experience gained through past review ... [and] findings about the pattern of care provided.

S.Rep. No. 1230, 92d Cong.2d Sess. 257 (1972).

Based upon the foregoing legislative history, it appears that in general, Congress would approve the use of utilization screens in processing claims.

The caselaw indicates that the use of utilization screens would contravene the statute if they were used as absolute denial mechanisms or as irrebuttable presumptions which foreclosed any meaningful opportunity to receive an individualized determination of medical necessity. For example, in *City of New York v. Heckler*, 578 F.Supp. 1109 (E.D.N.Y.1984), *aff'd*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), the court found the denial of benefits arbitrary and contrary to the Social Security statute when the Social Security Administration ("SSA"), relied on bureaucratic instructions rather than individual assessments in determining disability, and in applying the instructions, overruled the medical opinions of even its own consulting physicians that a particular claimant could not work. Similarly, in *LeDuc v. Harris*, 488 F.Supp. 588 (D.Mass.1980), the court found that one of the crucial issues in the granting of benefits—whether a certain wheelchair constituted durable medical equipment under the statute—was foreclosed by a categorical pre-determination of fact made by the Secretary in a policy statement which the ALJ was bound to follow. Therefore, the court found that there was no fair hearing.

In the instant case, there is no categorical determination of overutilization that the reviewers are bound to follow; plaintiffs have an opportunity to present additional information to demonstrate medical necessity which may overrule the presumption of overutilization created by the screens.

The Court disagrees with plaintiffs' assertion that *Tripp v. Coler*, 640 F.Supp. 848 (N.D.Ill.1986) and *Fox v. Bowen*, 656 F.Supp. 1236 (CCH) Medicare & Medicaid Guide $35,374 (D.C.Conn.1986), support a finding that Transamerica's use of utilization screens violates the Medicare statute.

In *Tripp*, the court held that the Illinois Department of Public Aid's ("IDPA's") method of identifying which recipients have overused medical services violated the Medicaid statute. The Department's utilization review program identified overusers based upon statistical comparisons of the frequency of the recipient's medical usage without regard to other significant factors such as medical need. Once an overuser was identified, the Department sent the cardholder a notice that the patient was required to select a single primary care physician to provide all the patient's emergency care. This requirement was called the lock-in provision.

The Medicaid Statute requires that beneficiaries have freedom of choice in choosing their providers. However, Congress enacted an exception to the Statute in 1981 to allow a State to "lock-in" chronic overutilizers of service to a single physician or limited group of providers for a reasonable period of time if the State found, after notice and opportunity for a hearing, that the individual utilized services at a frequency not medically necessary. 42 U.S.C. § 1396n(a)(2)(A). Congress made clear in the legislative history that such waivers of the freedom of choice principle should apply only to those recipients that clearly and without doubt overutilized services. *See* H.R.Rep. No. 158, 97th Cong., 1st Sess., Vol. II, 309 (1981).

The *Tripp* court held that the Department's method of identifying overusers solely by a statistical review of level of medical usage without any information on his or her medical condition or needs contravened the statute. The court reasoned that a determination of medical necessity at a minimum requires some evaluation of medical condition.

Also, while the *Tripp* court stated that there was "nothing improper about using a statistical analysis as a starting point," 640 F.Supp. at 855, it was improper to proceed "directly from that indication of possible overuse to a requirement that the recipient, within a limited time frame, obtain from his or her physician a formal justification of the level of use." *Id.* Pursuant to the Medicaid Statutory scheme, the court found that "It is up to the Department ... to satisfy itself that the level of use is not medically necessary, not for a recipient with a high level of use to establish that it is medically necessary." *Id.*

In *Fox v. Bowen*, the court held that the Secretary's practice of denying skilled physical therapy benefits under Part A of Medicare on the basis of arbitrary presumptions or "rules of thumb" violated the Medicare statute, regulations and the Due Process Clause of the Constitution. The court found that while daily skilled physical therapy is required in a wide variety of circumstances, the DHHS granted Medicare coverage only to a small number of patients who demonstrated a "rapid recovery of body function." DHHS denied coverage for daily skilled therapy even when such therapy had been ordered by the patient's treating physician, and even when the expert testimony showed that therapy was necessary such as during the "non-weight-bearing" stage of rehabilitation for fracture patients in order to prevent the patient's joints from stiffening and his or her muscles from wasting while the injury heals. The court found that such denials of coverage resulted in many patients foregoing medically necessary physical therapy because they or their families could not afford to pay, thus jeopardizing their chances for recovery.

In *Fox*, the Skilled Nursing Facilities (SNFs) first determined whether services received by the patient were covered. If the SNF granted the claim, it was required to provide the fiscal intermediary with extensive documentation of the patient's medical condition. The intermediary could then decide on the basis of this information to reverse the SNF's initial award. However, when the SNF initially *denied* a claim, the SNF was not required to provide the intermediary with any information concerning the patient's condition unless the patient sought reconsideration. Unlike the instant case where review of the initial Transamerica determination to deny coverage is requested 50% of the time, the court found that between January, 1977 to September, 1979, only 2.4% of all SNF initial determinations were appealed for reconsideration and only 0.3% were taken to a subsequent hearing before an ALJ. Strikingly, the evidence showed that approximately 80% of the initial denials of coverage to SNF patients for physical therapy services were reversed on appeal to the intermediary, the Secretary or a federal district court.

The *Fox* court found that the applicable regulations and the Health Insurance Manual 13 (HIM–13) "clearly contemplated" that each patient would receive an individualized assessment of his or her need for skilled therapy based on the facts and circumstances of his or her particular case. The court found it contrary to such regulations for an intermediary to deny benefits on the basis of informal presumptions, or "rules of thumb," that are applied across the board without regard to the medical condition or therapeutic requirements of the individual patient.

The instant case is distinguishable. Unlike *Tripp*, where overusers were identified solely by a statistical review of the level of medical usage, and *Fox*, where coverage for skilled physical therapy was granted based on a rule of thumb only to patients who demonstrated a "rapid recovery of body function" and was denied even when the treatment was ordered by the patient's treating physician, claims identified under a Transamerica frequency screen focus on

medical necessity. The screens represent a point at which Transamerica has determined that the given item or service is unlikely to be medically necessary and is likely to be unnecessarily overutilized, absent particular circumstances which serve to justify the medical necessity of the items or services for which Medicare coverage is being sought. If a claim is denied at the initial level, the beneficiary is notified that Medicare does not usually pay for this many visits or treatments, and invites the beneficiary to submit additional documentation showing why, in his or her case, the number of treatments or visits was medically necessary, contrary to the carrier's initial conclusion. (Similar Notice should be provided after the review determination level. See Section III).

In addition, whereas placing the burden of proof on the recipient to demonstrate medical necessity may violate the Medicaid Statute, the burden of proof with respect to Medicare claims rests on the beneficiaries. Indeed, plaintiffs do not dispute that the Medicare Statute requires beneficiaries and their physicians to submit the necessary documentation to justify payment of benefits. *See* 42 U.S.C. § 1395*l*(e); 42 C.F.R. § 405.252(a) (1986).[4] *See also, Friedman v. Secretary of DHHS*, 819 F.2d 42 (2nd Cir.1987) (Although the Social Security Act is to be liberally construed in favor of beneficiaries, a claimant nevertheless has the burden of proving entitlement to Medicare benefits.). Moreover, unlike *Fox* where only 2.4% of all initial determinations were appealed, and *Tripp*, where only 5.6% of the restricted recipients requested reevaluations, approximately 50% of Medicare beneficiaries denied coverage by Transamerica at the initial determination level seek review.

Defendants claim that the Ninth Circuit's decision in *Dirksen v. DHHS*, 803 F.2d 1456 (9th Cir.1986), further supports their position that the use of utilization screens does not violate the Medicare statute. In *Dirksen*, plaintiffs, a physician and his medical group, sought to obtain the Medicare utilization screens ("the Medicare Policy Guidelines" or "Guidelines") used by Blue Cross of California, the carrier in Northern California, under the Freedom of Information Act ("FOIA"). The court held that the guidelines were exempt from disclosure pursuant to 5 U.S.C. § 552(b)(2) which protects from disclosure "matters that are … related solely to the internal rules and practices of an agency." *Dirksen*, 803 F.2d at 1458. The court found that the guidelines did not "define new classes of approved services different from what the public understands to be 'covered;' instead, they merely categorize, for speed in processing, which claims are to be automatically granted, denied, or reviewed in more detail." *Id.* The court feared that if the guidelines were disclosed, providers would adjust the presentation of their claims to fit into the "automatically granted" category, and thus destroy the utility of the guidelines.

While the *Dirksen* decision contains language supporting the use of "internal claims processing blueprints which enable Blue Shield to handle the millions of claims it receives each year uniformly and expeditiously," the decision does not specify what types of screens were involved in that case, how the screens were applied, and whether beneficiaries had a meaningful opportunity to get an individualized assessment of their claims. Therefore, this court does not rely on *Dirksen* to support Transamerica's use of frequency of service screens.

Transamerica's use of frequency of service utilization screens is supported generally by the legislative history. The facts of

---

4. 42 U.S.C. § 1395*l* (e) provides that "No payment shall be made to any provider of services or other person under [Part B] unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under [Part B] for the period with respect to which the amounts are being paid or for any prior period."

42 C.F.R. § 405.252(a) (1986), entitled "No payment unless information furnished" provides that "No payment may be made to any person, organization or to any provider of services unless the information necessary to determine the amount due has been furnished."

this case demonstrate that the screens do not serve to deny claims based upon rules of thumb which ignore medical condition, and effectively preclude individualized assessments of need. Rather, the screens represent a point at which Transamerica has determined that it is *unlikely* that the service is medically necessary. If a claim is denied at the initial level, the claimant is invited to submit additional information to demonstrate that in his or her case, the number of visits or treatments was necessary. Such review is sought approximately 50% of the time. This process conforms to the Medicare statute which requires the claimant to submit the necessary documentation to justify payment of benefits. Therefore, Transamerica's use of frequency of service screens does not violate the statute.

## III. NOTICE

### A. *Introduction*

Plaintiffs argue that in order not to offend due process, review determination notices must inform beneficiaries that the denial of their claim was based, in part, on the application of a utilization screen. Plaintiffs submit that (1) this would give beneficiaries accurate information as to why their claim was denied, and (2) that this information would assist beneficiaries in preparing an appeal, since they would be alerted that if certain additional information is presented, they would be able to override the screen.

Defendants contend that including utilization screens as a reason for the denial of a claim on review would *not* be accurate or proper (in fact would be a lie) since the "uncontroverted" evidence is that screens are not used at all at the review level. Also, defendants argue that there is no due process violation since beneficiaries have been adequately notified of the reasons for denial of their claims in the EOMB notices after the initial determination. (In *Gray Panthers v. Schweiker*, 652 F.2d 146 (D.C. Cir.1981), the court held that due process requires notice in EOMBS.) As a result of the Gray Panthers settlement, this notice must contain language that a frequency of

service was exceeded, and that the beneficiary may supply rebutting evidence to show that the services were medically required.

### B. *Use of Screens as Basis For Denials of Claims at Review Level*

The first issue to resolve is whether utilization screens are the basis, either directly or indirectly, for the denial of claims on the review level. The utilization screens are used as a guide throughout the review process. As explained above, the screens set numerical parameters for certain procedures based on a calendar month, quarter, and year. A frequency to time comparison is used as a screening device to determine if further review of medical necessity is warranted. These parameters reflect the defendants' decision of when the threshold of medical necessity is exceeded.

When a claim is received by Transamerica, it is entered into a computer by a level one claims examiner. If the claim does not exceed the parameters, it is paid. If it does exceed the parameters, the claim is suspended and sent to a level two claims examiner. At this stage, the claims examiner has a record of all of the services rendered to the beneficiary over the last three years. The examiner then refers to the manual instructions that accompany the utilization screens and to a profile to determine the medical provider's patterns of billing and service. If a diagnosis is available, it is reviewed by the examiner. Plaintiff argues that a patient's diagnosis is generally not available, and both parties agree that patients are not instructed to submit medical papers along with their claims.

The beneficiary is then sent an Explanation of Medicare Benefits (EOMB) with payment or explaining why payment for services is denied. Beneficiaries are informed that they may seek further review at the review determination level. At the review determination level, the claims reviewer has complete discretion to pay or affirm the original decision.

Defendants argue that screens are not applied at the review level, but concede

that they are used as guides to assist the reviewer in determining medical necessity. The court agrees with the defendants that if additional evidence is submitted on review and the claim is denied, the reason may be that the evidence supported the presumption created by the screen that the claimant overutilized services and that the services were not necessary. (In the instant case, the reason for the denial was that Vorster did not submit an x-ray as required by statute.) Unless additional evidence is submitted at the review determination stage, however, once a claim is suspended because of a utilization screen, the claim will continue to be denied.

Transamerica does not request beneficiaries to submit diagnosis papers or any other information to assist in the review decision. Generally, claims submitted by beneficiaries include the claim form and the attached doctor's bills. (Stadler, Exhibit I, 15, 17; Declaration of Aileen Harper, Exhibit J). Even when additional information is submitted by beneficiaries, it usually addresses a technical issue and is not of a medical nature. Consequently, the additional information cannot overcome the presumption created by the utilization screen. (Harper, Exhibit J; Deposition of David Olch, Exhibit L, at 20; Deposition of Audrey Brooks, Exhibit M, at 24).

Defendants claim that all decisions are individually made based upon the facts at hand and the claimant's medical condition and history. This appears inconsistent with statements made by employees of the defendant that additional information is rarely requested due to time and resource limitations. (Olch, Exhibit L, at 19; Villeagas, Exhibit N, at 15). The majority of information requested is not connected with medical necessity. (Villeagas, Exhibit N, at 15).

Defendants review approximately 1,200 claims a day, but the Medical Department only receives 20 to 30 requests for assistance a week. This percentage appears insignificant when compared to the huge volume of claims reviewed by the defendant every week. Furthermore, the majority of the requests seek advice on medical technology, not on the medical necessity of a procedure. (Villeagas, Exhibit N, at 15).

Although information may be submitted at the review stage, in many cases it is not. In 1984, Transamerica received requests for review from roughly 50% of the claimants initially denied. Of the 50% who request review, it is unclear what percentage submit additional information on their medical conditions. The testimony ranged from 10% (Villegas at 15, defendants' memo at exh. H) to 50% (Lopez at 17, defendants' memo at exh. B).

Because of a lack of additional information, the claims reviewers must rely upon the manual for the utilization screen and the profile of the medical provider. Consequently, due to the absence of additional information about medical necessity, the screens are indirectly applied on review. Moreover, in the absence of additional information or a clerical error, the claim continues to be denied at the review stage.

Therefore, the court finds that while the utilization screens are not directly applied on review, if additional evidence is not submitted, the screen is effectively applied on review.

C. *Requirements of Due Process*

■ Constitutional due process requires notice that gives the (carrier's) reasons for its action in enough detail that a recipient can prepare a responsive defense. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The reasons included in the denial of Medicare benefits must be specific enough to inform the recipient how the (carrier's) decision was reached. *Tripp v. Coler*, 640 F.Supp. at 858 (citing *Gray Panthers v. Schweiker*, 652 F.2d 146, 169 (D.C.Cir.1981)). In addition, they must give plaintiffs an "opportunity to meet" the case against them. The Seventh Circuit recently agreed that individuals faced with losing a legal interest must be afforded due process protections with specific reasons for the denial. *Cosby v. Ward*, 843 F.2d 967 (7th Cir.1988).

Plaintiffs' interest in receiving Medicare reimbursement is sufficient to invoke due process protections. *David v. Heckler*, 591

F.Supp. 1033 (E.D.N.Y.1984). The court in *David* also addressed the sufficiency of Medicare Part B review determination notices. In *David*, the court started with the balancing test formulated by the court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In *Mathews*, the court found that the factors to be considered in determining whether certain procedures are constitutionally required are:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903.

The *David* court noted that the *Eldridge* balancing test has been applied to due process challenges to Medicare procedures on other occasions. *See, e.g., Gray Panthers*, 652 F.2d at 165–166.

D. *Application of The Eldridge Test*

■ In order for claimants to invoke due process protections a substantial private interest must be affected by official action. The private interest, in this case, is the claimant's need to obtain reimbursement for medical bills that he or she has already paid. This interest is fairly great. Congress enacted the program because of the special coincidence of medical needs and financial problems of the elderly. *Gray Panthers*, 652 F.2d at 166; *See Generally* 1965 U.S.Code Cong. and Admin.News 1943.

A claimant's eligibility for Medicare is not based on need, but a disproportionately large number of recipients are near the poverty level. *Gray Panthers*, 652 F.2d at 166. Denying payment for a relatively small amount of money can be very significant to a person living on a fixed income. "[M]any small denials aggregated over a year may be substantial. The total cost of medical care to the elderly can be enormous." *David v. Heckler*, 591 F.Supp. at

1041 (citing *Kraemer v. Heckler*, 737 F.2d 214, 221 (2nd Cir.1984)). Clearly, there exists a substantial private interest in obtaining reimbursement for medical bills.

The second prong of the *Eldridge* test addresses the risk of erroneous deprivation of a private interest through procedures used. In the instant case, no information was presented to the court as to the reversal rate of the previously denied claims. The plaintiffs do submit figures about the number of appeals received by Transamerica. In fiscal year 1984, Transamerica denied 85,314 claims due to utilization screens. Of the claims denied by Transamerica, they received 45,491 requests for review. HCFA requires all carriers to maintain a cost benefit ratio of 1:5 (cost of review process versus what carriers save in denied claims). In 1985, Transamerica's cost benefit ratio was 1:16.5. The figures quoted assume that every claim rejected was properly denied. The Court has no documentary evidence to rely on for a finding that the risk of erroneous deprivation from the screens is high. However, it appears unlikely that every claim denied or reduced by Transamerica was proper. It is reasonable to infer that the risk of erroneous deprivation is significant from the fact that screens generalize about something which is highly idiosyncratic—medical condition and medical necessity.

Furthermore, the notice provided in the EOMBs does not eliminate the risk of erroneous deprivation of the beneficiaries' interest. The EOMB provides information as to why a claim was denied after the initial determination stage. Even with adequate notice in the EOMB, the beneficiary still may not understand what information to submit to the carrier.

After receiving a denial at the review determination level, the beneficiary may request a hearing if their claim exceeds one hundred dollars. The hearing is the last opportunity for review of a claim by the carrier. Beneficiaries have an opportunity to speak with the carrier directly at the hearing for the first time. In order to prepare for the hearing, beneficiaries should know the specific reasons why pay-

ment was denied. Without this information, it is impossible for the beneficiary to prepare for the hearing. The *Gray Panthers* court explained the predicament faced by beneficiaries when appealing denied claims.

Without notice of the specific reasons for denial, a claimant is reduced to guessing what evidence can or should be submitted in response and driven to responding to every possible argument against denial at the risk of missing the critical one altogether.

*Gray Panthers*, 652 F.2d at 168–169.

Thus, a separate notice after the review determination stage is essential to inform beneficiaries of the arguments they must meet at the hearing stage. Importantly, the reason for the denial of a claim at the review determination stage may differ from the reason at the initial review stage. Additionally, there is a significant time lapse between the issuance of an EOMB and the decision rendered after the review determination stage. Finally, beneficiaries' failure to appeal their denials of benefits is attributable in significant part to their age and ill health. Many beneficiaries are simply unable to deal with the bureaucratic hurdles involved in filing an appeal. *David v. Heckler*, 591 F.Supp. at 1044. These "factors only accentuate the need for adequate notice as to the specific basis for denials." *Gray Panthers*, 652 F.2d at 168. The elderly, many of whom are in poor health, should have access to as much information about their denial as reasonably possible. Without such notice, the beneficiaries ability to appeal the decision is insufficient. Consistent with this, the Court finds that adequate notice is required at the review determination stage.

Finally, the *Eldridge* test considers the cost to the government of additional procedures. In this case, requiring defendants to state in their notices that a basis for denial was that a frequency of service was exceeded which could be overcome if additional evidence were submitted does not seem too burdensome. Defendants are unable to persuade the Court that there would be a significant cost or inconven-

ience involved. Defendants already prepare notices at the review determination level to inform beneficiaries of action on their appeal. A requirement to include adequate notice at this level does not place a significant burden on the defendant.

In conclusion, in view of the *Eldridge* factors, the Court finds that notice after the review determination stage is constitutionally mandated. The beneficiaries' interest in obtaining reimbursement for medical bills is great. The burden of providing adequate notice is not substantial enough to warrant the risk of erroneous deprivation of the beneficiaries' interest. The interest at stake and the risk involved outweigh any burden.

### E. *Particular Language Required in Notice*

Therefore, the Court determines that the review determination notices must be revised to contain language that a frequency of service was exceeded, and that the beneficiary must supply additional information from their physician to demonstrate that the service was medically necessary.

Plaintiffs argue that defendant should be required to state that utilization screens are used in determining payment of claims. The Court does not find it necessary or even desirable for defendants to state in the notices that the services were denied based on a "utilization screen." This is Medicare jargon that many people may not understand.

Instead, the language should be revised to contain language that a frequency of service has been exceeded. In this way, the reasons for the denial will be clear and enable beneficiaries to seek further review of their claims at a hearing.

### IV. THE SECRETARY'S FAILURE TO IMPLEMENT THE SETTLEMENT AGREEMENT

█ In the Stipulation signed by the parties on November 7, 1985, the Secretary agreed to make the following change to the Medicare Manual:

a. The manual will require that review determination notices issued by the carriers set forth specific separate reasons for the

denial of each separate occasion (or date) of service.

This was to avoid the practice of lumping together a number of different dates of service with a single explanation. It appears that in an original version of the stipulation, there was no language to the effect that separate reasons were required "for each separate occasion (or date) of service." The plaintiffs brought this to defendants' attention in a letter (see Exh. R to plaintiffs' memorandum of points and authorities), and the change was agreed to by defendants.

The manual language reads as follows: "The specific number and kinds of services reviewed and a separate explanation of denial ... relevant to each particular service." (See Exh. E to defendants' memorandum of points and authorities.) Defendant submits that the language "each particular service" will be understood to mean "separate occasion" or "separate date" of service. (See Exh. C to defendants' opposition [letter from the DHHS explaining the manual changes to plaintiffs' counsel]).

As proof that the language in the manual is "ineffective" to get the carriers to stop the practice of "lumping," plaintiffs submit one review determination notice prepared by defendant which does contain the "lumping" defect. (See Exh. D to plaintiffs' opposition.) Defendants state that this improper implementation of the manual will be corrected pursuant to HCFA's performance review process of its carriers.

This single instance of error does not show that the defendants have not implemented the stipulation. Defendants stipulated to change the Manual, and they did. Thus, the Court finds that the Secretary has satisfactorily implemented the settlement agreement. Should defendants continue to lump services together in notices, and if the HCFA does not respond, plaintiffs may raise this issue again at a later date.

IT IS SO ORDERED.