Gregoria GRIJALVA, Carol Knox, May Lea, Beatrice Bennett, and Mildred Morrell, as individuals and representatives of a class of persons similarly situated, Plaintiffs,

Josephine Balistreri, Fred S. Scherz, Kevin A. Driscoll, Mina Ames, Edmundo B. Cardenas, Arline T. Donoho, Patricia Sloan, Beth Robley, Goldie M. Powell and Richard Baxter, Plaintiffs–Intervenors,

v.

Donna E. SHALALA, Secretary of Health and Human Services, Defendant.

Civ. No. 93–711 TUC ACM.

United States District Court, D. Arizona.

Oct. 17, 1996.

Sheila M. Lieber, Michael J. Haungs, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant.

## ORDER

MARQUEZ, Senior District Judge.

This action involves the Medicare program and its coverage of medical care dispensed by Health Maintenance Organizations (HMOs).[1] Plaintiffs seek declaratory and injunctive relief against the Secretary for abdicating her responsibility to monitor HMOs and to ensure that HMOs provide Medicare covered benefits. Plaintiffs ask .that the Court order Defendant Shalala, Secretary of Health and Human Services, to implement and enforce effective notice, hearing, and appeals procedures for HMO service denials. Plaintiffs and Defendant simultaneously move for summary judgment.

Defendant alleges that HMOs are privately owned entities and their actions cannot be imputed to the federal government. Defendant contends that this Court has no jurisdiction to review the Health Care Finance Administration's (HCFA's) supervision of HMOs. Defendant asserts that neither the Administrative Procedure Act (APA), Constitution, or the Medicare statutes provide for judicial oversight of the Secretary.[2] Defendant repeats her previous argument that, here, there can be no judicial review because Plaintiffs failed to exhaust their administrative remedies.

Plaintiffs seek summary judgment for Defendant's failure to enforce service requirements on HMOs in violation of statutory mandates and the Due Process Clause of the Constitution. Plaintiffs complain HMOs either fail to provide any notice or provide inadequate notice when medical services are

Sally Hart Wilson, Center for Medicare Advocacy, Inc., Southern Arizona Legal Aid, Tucson, AZ, for Plaintiffs.

---

1. These plans include Competitive Medical Plans (CMPs) which provide more limited services than an HMO. Either type of plan can be a public or private entity. Both are risk-based, e.g. paid on a flat rate basis, rather than fee-for-service. Risk based organizations receive a predetermined per capita monthly prospective payment to cover Medicare beneficiaries. The organization is responsible for any difference between the prepaid capitated amount and the actual costs incurred to furnish medical services to its Medicare enrollees, hence the term "at risk."

2. Defendants charge that Plaintiffs fail to specify the legal basis for their claims. The Court resolved this issue on December 15, 1994, when it denied Defendants' Motion to Dismiss. This Court waived the requirement of exhaustion under 42 U.S.C. § 405(g) and held that jurisdiction exists over this case pursuant to 42 U.S.C. § 1395mm. See Order filed December 15, 1994.

denied. Plaintiffs contend that the Constitution requires an expedited hearing before an HMO can deny services and that HMOs carry the burden of proof for Medicare denials.

## A. Jurisdiction Revisited: 42 U.S.C. § 405(g)

■ Section 405(g) of the Social Security Act applies to service denials by HMOs because 42 U.S.C. § 1395mm provides:

(B) A member enrolled with an eligible organization under this section who is dissatisfied by reason of his failure to receive any health service to which he believes he is entitled and at no greater charge than he believes he is required to pay is entitled, if the amount in controversy is $100 or more, to a hearing before the Secretary to the same extent as is provided in section 405(b) of this title, and in any such hearing the Secretary shall make the eligible organization a party. If the amount in controversy is $1000 or more, the individual or eligible organization shall, upon notifying the other party, *be entitled to judicial review of the Secretary's final decision as provided in section 405(g) of this title,* and both the individual and the eligible organization shall be entitled to be parties to that judicial review. (emphasis added).

42 U.S.C. § 405(b) requires that the Secretary make findings of fact, and decide the rights of any individual applying for a payment under this subchapter. Any decision by the Secretary which is in whole or in part unfavorable to a claimant "shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Secretary's determination and the reason or reasons upon which it is based." 42 U.S.C. § 405(b). Further:

Upon request … and showing in writing that rights may be prejudiced by any decision the Secretary has rendered, [the Secretary] … shall give … reasonable notice and opportunity for hearing. If a hearing is held, [the Secretary] shall, on the basis of evidence adduced at the hearing, affirm, modify, or reverse his findings of fact and such decision. Any such request … must be filed within sixty days after notice of such decision is received….

*Id.*

42 U.S.C. § 405(g) provides for judicial review of a final decision by the Secretary. "A final judgment in the context of § 405(g) and § 1395mm(c)(5)(B) consists of two elements: (1) the presentment of a claim to the Secretary; and 2) exhaustion of administrative remedies. *Johnson v. Shalala,* 2 F.3d 918, 921 (9th Cir.1993)." (Order filed December 5, 1994 at 4.) The presentment requirement, the non-waiveable criteria for jurisdiction, is not an issue here, *Id.* at 5; all Plaintiffs in the instant case filed claims for Medicare covered services and protested HMO denials. (Plaintiffs' Supplement to Plaintiffs' Memorandum in Support of Motion for Certification of Class Action filed June 26, 1995.) This Court waived the exhaustion requirement by its Order of December 15, 1994, (*See* Order at 5–8); this Court previously held, and again affirms, that jurisdiction exists under § 405(g).

Abundant case law supports such jurisdiction under § 405(g) for challenges involving various Social Security entitlement Programs. *See e.g.: Johnson v. Shalala,* 2 F.3d 918 (9th Cir.1993) (exhaustion waived: Social Security Income (SSI) recipient challenged Social Security Administration policy of counting all in-kind loans as income); *Briggs v. Sullivan,* 886 F.2d 1132 (9th Cir.1989) (exhaustion waived: challenge to Secretary's policy of withholding SSI beneficiaries' representative payments during time beneficiary was without representation; declaratory and injunctive action against Secretary for improper policy and procedure); *Schoolcraft v. Sullivan,* 971 F.2d 81 (8th Cir.1992) (exhaustion waived: Social Security disability beneficiaries challenged Secretary's failure to ensure that uniform standards were applied at all levels of review, specifically initial determination conducted by state agency), *cert. denied,* 510 U.S. 1081, 114 S.Ct. 902, 127 L.Ed.2d 93 (1994); *Himmler v. Califano,* 611 F.2d 137 (6th Cir.1979) (exhaustion waived: applicants for Medicare benefits alleged due process violations when benefits were terminated by fiscal intermediary without notice and hearing); *Kraemer v. Heckler,* 737 F.2d

214 (2nd Cir.1984) (exhaustion waived: due process challenge to Secretary's policy of allowing Utilization Review Committee (URC) to terminate Medicare without notice or hearing); *Goodnight v. Shalala*, 837 F.Supp. 1564 (Utah 1993) (exhaustion waived: claim against state agency for procedural irregularities violating Medicare regulations and against Secretary for failure to enforce); *Vorster v. Bowen*, 709 F.Supp. 934 (C.D.Cal.1989) (exhaustion waived: due process challenge to initial determination of coverage by private carrier providing Part B, Medicare supplemental insurance); *Fox v. Bowen*, 656 F.Supp. 1236 (D.Conn.1987) (exhaustion waived: fiscal intermediaries' routine denials of Medicare coverage, based on improper presumptions, for certain categories of physical therapy violated due process).

Assuming this Court correctly waived the exhaustion requirement for jurisdiction under § 405(g), there is nothing unique about 42 U.S.C. § 1395mm and its provisions for judicial review via § 405(g) of the Social Security Act which affects jurisdiction over claims against the Secretary just because dispensation of medical care is via an HMO.

## B. State Action: HMO Service Denials

■ Defendant makes much of the fact that HMOs are private, non-governmental entities because it is a fundamental rule of law that due process under the Fourteenth Amendment attaches only to actions which may fairly be said to be those of the state. *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). Therefore, Plaintiffs' claim hinges on whether HMO denials of service constitute state action.

Defendant argues that HMOs are merely private providers who contract with the government to provide medical care to Medicare beneficiaries. Defendant's scenario fits within the protected confines of *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). In *Blum*, the Supreme Court found nursing home decisions to transfer patients to lower care facilities did not constitute state action even though the transfer decision resulted in a corresponding termination of benefits. The transfer decisions, made by attending physicians and home administrators,[3] were made by private parties according to professional standards. *Id.* at 1008, 102 S.Ct. at 2787–88. Since there was no evidence that the State had exercised coercive power or provided significant encouragement, overt or covert, there could be no finding in law of state action. *Id.* at 1004, 102 S.Ct. at 2785–86.

Defendant, the State of Arizona, made this same argument in *J.K. v. Dillenberg*, 836 F.Supp. 694 (Ariz.1993): "REBHAs [regional behavioral health authorities] are responsible for the decision making that Plaintiffs seek to enjoin, but [ ] they function as private entities whose actions cannot be attributed to the state." *Dillenberg*, 836 F.Supp. at 697. Judge John M. Roll distinguished the nursing homes in *Blum* as private providers which did not execute state responsibilities for a state created service, *Id.* at 698, from those in *Dillenberg*, where the state had delegated the entire responsibility for its mandated behavioral health care duties to REBAHs. The state action factors in *Dillenberg* were: 1) the private entities, REBHAs, were subject to extensive state involvement; and 2) the contract required REBHAs to " 'comply with all Federal, State, and local laws, rules, regulations, standards and executive orders, governing performance of duties … and shall comply with provisions of federal laws and regulations governing the Title XIX Program….'" *Id.* at 698–99.[4]

---

**3.** URC transfers were not at issue in *Blum*, the issue having been settled prior to the Supreme Court's review of the case. *Blum* left open the issue of whether URC transfers constituted state action. *Kraemer v. Heckler*, 737 F.2d at 220.

**4.** Following *Dillenberg*, Judge Richard M. Bilby ruled in *Perry v. Chen*, CIV 95–140 TUC RMB, 1996 WL 159808, that there was state action when HMO, AHCCCS health plans terminated authorization for previously covered Medicaid services. Judge Bilby reasoned the Due Process Clause of the Constitution requires notice and an opportunity for a face-to-face hearing because: 1) the HMOs are paid by AHCCCS for covered services; 2) the HMOs' activities are regulated by AHCCCS; 3) AHCCCS issues directives which plans must follow and creates through rules, contracts and policies the framework under which the plans act to dispense medical care to

· Similarly, the Second Circuit recently found that decisions made by certified home health agencies (CCHAs), non-governmental private entities, to deny or reduce the amount of home health care prescribed for Medicaid recipients are "state actions" that trigger due process rights to a fair hearing. *Catanzano v. Dowling*, 60 F.3d 113 (2nd Cir.1995). The Second Circuit found that the state defendants exercised significant control over the CCHAs: 1) the government paid for covered services; and 2) the government regulated CCHAs activities, issued directives which could not be ignored and created the legal framework which governed the grievous activities. The Circuit found Judge Roll's reasoning in *Dillenberg* persuasive:

"It is patently unreasonable to presume that Congress would permit a state to disclaim federal responsibilities by contracting away its obligations to a private entity."

*Id.* at 118 (quoting *Dillenberg*, 836 F.Supp. at 699).

It seems equally unreasonable that Congress would permit the Secretary to disclaim her responsibility to "determine whether individual is entitled to benefits under part A or part B of [Medicare], and [to determine] the amount of benefits under part A or part B of [Medicare]." 42 U.S.C. § 1395ff; *see also*, 42 U.S.C. § 405(b) (Secretary shall make findings of fact, and decide the rights of any individual applying for a payment under Medicare).

Other criteria of *Dillenberg* and *Catanzano* for finding state action apply as well: 1)

the government pays for covered services; 2) the government regulates HMOs' activities as they apply to Medicare beneficiaries, especially benefit coverage determinations; 3) the Secretary issues regulations and directives which cannot be ignored; the Secretary creates the legal framework which governs the activities complained of by Plaintiffs;[5] and 4) Medicare beneficiaries appeal HMO service denials directly to the Secretary, who has the power to overturn the HMO decision.

Defendant's argument that HMOs are *Blum*-type private providers ignores the Medicare scheme.[6] In risk-based, managed care, the HMO performs two functions: direct provider of medical care and insurer. In the fee-for-service system, separate entities perform these functions: medical providers, i.e., doctors, and insurance companies, e.g. Blue Cross Blue Shield. This case questions the performance of the latter function by private provider HMOs.

There is really nothing new about a private, non-governmental entity being involved in the administrative arena of Medicare.

The determination and review procedures for claims arising under the two parts of the Act [Parts A and B] are similar. *Both are administered primarily through nongovernmental organizations,[7] usually insurance companies, pursuant to contracts with the Department.* (footnote omitted). Claims for payment or reimbursement are submitted to the carrier, which makes an initial determination as to the claim and sends a notice of its action together with any payment to the claimant. If the claim-

---

AHCCCS beneficiaries; 4) the challenged HMO decisions are based on medical judgment and cost effectiveness; and 5) appeal of HMO decisions are made to AHCCCS which has the ultimate power to correct erroneous denials. Judge Bilby concluded that the HMOs assumed obligations of the state to provide Arizona's version of Medicaid (AHCCCS) benefits to the needy.

5. The Secretary has the power to inspect and audit the HMOs to determine quality of service and financial stability. 42 U.S.C. § 1395mm(i)(3). The Secretary can terminate HMO contracts, 42 U.S.C. § 1395mm(i)(3), or impose civil fines for noncompliance, 42 U.S.C. § 1395mm(i)(6)(B). *See also*: Section C of this Order setting out the regulatory provisions under which HMOs are required to operate, specifically

the notice and appeal procedures which apply to Medicare service denials.

6. Congress created the Medicare program in 1965 by enacting Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* In 1972, Congress expanded Medicare to cover the permanently disabled and authorized the program to reimburse HMOs for services to Medicare beneficiaries. The Tax Equity and Fiscal Responsibility Act of 1982, § 114(a), weakened participation standards for HMOs and prompted widespread use of risk-based HMOs by Medicare.

7. Under Part A of Medicare, the organizations are called "intermediaries." Under Part B, the organizations are called "carriers."

ant is dissatisfied, a request for review may be made, (footnote omitted).

*Gray Panthers v. Schweiker,* 652 F.2d 146, 149 (D.C.Cir.1980) (emphasis added). These fiscal intermediaries act as agents for the Secretary. *Kraemer v. Heckler,* 737 F.2d at 215 (citing 42 U.S.C. § 1395h); *Fox v. Bowen,* 656 F.Supp. at 1249 (Conn.1987); *see also: Himmler v. Califano,* 611 F.2d at 140 (fiscal intermediary is alter ego of Secretary for day-to-day administration of Medicare program); *Vorster v. Bowen,* 709 F.Supp. at 946–47 (denials issued by carrier treated like official action; court found due process required detailed notice of reasons for denial by carrier).

There is nothing unique about the performance of these same duties by HMOs which warrants a contrary finding here. Even if HMOs' performance of administrative duties is somehow distinguishable from those authorized by 42 U.S.C. § 1395h, the Court finds that HMO denials of Medicare services are properly held state action under the analysis set forth in *Dillenberg* and *Catanzano.*

*C. Procedural Due Process and HMO Determinations That There is No Medicare Coverage for a Requested Service*

Defendant has not referred this Court to, and this Court has not found, any provision in the Medicare statutes or regulations pertaining to HMOs, to suggest that beneficiaries of Medicare who are denied services by HMOs are entitled to any less procedural due process than beneficiaries who are denied fee-for-service coverage. There is nothing in the Congressional record which suggests that Congress intended any less than full benefits and rights to apply when it embraced HMOs as Medicare providers.[8]

The Medicare statute, 42 U.S.C. § 1395mm(c)(2)(A), requires HMOs to provide the same range of services to plan enrollees as provided for Medicare beneficiaries generally.[9] HMOs are further required to:

(A) make the services described in paragraph (2) (and such other health services as such individuals have contracted for) (i) available and accessible to each such individual within the area served by the organization, with reasonable promptness and in a manner which assures continuity, and (ii) when medically necessary, available and accessible twenty-four hours a day and seven days a week, and

(B) provide for reimbursement with respect to services which are described in subparagraph (A) and which are provided to such an individual other than through the organization, if (i) the services were medically necessary and immediately required because of an unforeseen illness, injury, or condition and (ii) it was not reasonable given the circumstances to obtain the services through the organization.

42 U.S.C. § 1395mm(c)(4). HMOs "must provide meaningful procedures for hearing and resolving grievances between the organization ... and members enrolled with the organization under [the Medicare program]." 42 U.S.C. § 1395mm(c)(5)(A).

The regulatory scheme adopted by the Secretary to implement the statutory mandates of 42 U.S.C. § 1395mm [10] is very simi-

8. Defendants argue that Medicare enrollees in HMOs exchanged Medicare appeal rights for expanded medical care. The Court rejects this notion. As well, the Court does not consider the ability to disenroll from the HMO and reenroll with a fee-for-service provider appropriate relief for disputed HMO service denials. Such freedom of choice might serve to resolve disputes between treating physicians, but it would be poor public policy to offer such relief for service denials based on Medicare coverage determinations. As Plaintiffs point out, this would allow HMOs to shift their risk back to Medicare. Essentially, Medicare (the tax payer) would pay twice: once as a flat rate to the HMO ostensibly to cover the service and again as a fee-for-service, after the beneficiary disenrolled from the HMO and obtained the service.

9. Part A of Medicare provides: inpatient hospital services up to 150 days; post hospital extended care services up to 100 days. 42 U.S.C. § 1395d(a). Part B provides: home health care services; medical and other health services, such as physicians' services; outpatient physical therapy; certain health clinic services; outpatient rehabilitation facility services; and facility services furnished in connection with certain surgical procedures. 42 U.S.C. § 1395k(a)(2), (s), (x) (1992).

10. An HMO must establish grievance and appeals procedures, 42 C.F.R. § 417.600(a)(2)(i), for Medicare enrollees dissatisfied because they do not receive health care services to which they believe they are entitled, at no greater cost than

lar to that set out for initial fee-for-service coverage denials rendered by fiscal intermediaries or carriers. Reconsideration and appeal procedures for intermediary decisions on Part A claims are covered by 42 C.F.R. §§ 405.701–730; reconsideration and appeal for Part B claims are covered by 42 C.F.R. §§ 405.801–812. The two are essentially the same. *Gray Panthers,* 652 F.2d at 149, n. 6. Reconsideration procedures for HMO denials are set out in 42 C.F.R. §§ 417.600–694.

An HMO must establish and maintain appeal procedures for issues that involve organization determinations, 42 C.F.R. § 417.604(a)(1)(i):[11] 1) payment for emergency or urgently needed services; 2) any other health service furnished by a provider other than the HMO that the enrollee believes is covered under Medicare and should have been furnished by the HMO; and 3) HMO's refusal to provide services that the enrollee believes should be furnished by the HMO and enrollee has not received them outside the HMO. 42 C.F.R. § 417.606(a).[12] "Within 60 days of receiving the enrollee's request for payment for services,"[13] an HMO must give notice to an enrollee of any adverse organizational determination. 42 C.F.R. § 417.608(a).[14] The notice must state the specific reasons for the determination

and inform the enrollee of his or her right to reconsideration. 42 C.F.R. § 417.608(b).[15] Failure to provide timely notice constitutes an adverse organizational determination and may be appealed. 42 C.F.R. § 417.608(c).

The organizational determination is final and binding unless reconsidered. 42 C.F.R. § 417.612.[16] An enrollee who is dissatisfied with an organization determination may file a written request for reconsideration within 60 days of the determination.[17] 42 C.F.R. § 417.614; 42 C.F.R. § 417.616(c).[18] "The HMO [] must provide the parties to the reconsideration reasonable opportunity to present evidence and allegations of fact or law, related to the issue in dispute, in person as well as in writing." 42 C.F.R. § 417.618.[19]

"If the HMO [] can make a reconsidered determination that is completely favorable to the enrollee, the HMO issues the reconsideration determination." 42 C.F.R. § 417.620(a). The HMO must issue its favorable decision within "60 calendar days from the date of receipt of the request for reconsideration" or submit the file to HCFA. 42 C.F.R. § 417.620(c)-(f). If on reconsideration, the HMO partially or wholly affirms its denial, the HMO must prepare a written explanation and send the entire case to

---

they believe they are required to pay. 42 C.F.R. § 417.600(a)(2)(ii). These enrollees have the right to an ALJ hearing if the amount in controversy is $100 or more, 42 C.F.R. § 417.600(a)(2)(ii)(A), or have the right to judicial review, if the amount exceeds $1000, 42 C.F.R. § 417.600(a)(2)(ii)(B). "For any claimant whose disagreement with the [HMO] at this stage does not amount to more than $100, that is the end of the process, according to the Secretary's procedures. There is no further review, and there is at no time an opportunity to present one's case personally to the decisionmaker." *Gray Panthers,* 652 F.2d at 149 (assessing identical provisions pertaining to initial coverage denials rendered by Medicare carriers (42 C.F.R. §§ 405.720, 405.730, 405.815)).

11. *Compare* 42 C.F.R. § 405.801.

12. *Compare* 42 C.F.R. §§ 405.704, 405.803.

13. Unlike the fee-for-service system which determines coverage after services are rendered, the HMO system generally entertains the question based on an enrollee's request for medical services, prior to rendering care. Emergency, urgent care, and out-of-area services are provided by the HMO upfront and the initial determina-

tion for these services comes after the fact like fee-for-service denials. Therefore, HCFA's HMO Manual requires that the initial determination notice issue when a member requests payment or services. (Joint Statement of Facts at p. 20, HMO Manual 2403.2)

14. *Compare* 42 C.F.R. §§ 405.702, 405.803.

15. *Compare* 42 C.F.R. §§ 405.702, 405.804.

16. *Compare* 42 C.F.R. §§ 405.708, 405.804.

17. The request for reconsideration may be filed with the HMO, any local SSA office; or railroad retirement beneficiaries may file with the RRB. 42 C.F.R. § 417.616(a).

18. *Compare* 42 C.F.R. §§ 405.710, 405.711, 405.807 (Part B reconsideration has a 6 month filing limitation).

19. *Compare* 42 C.F.R. §§ 405.715 (HCFA performs Part A reconsideration; there is no right to in person participation by the beneficiary), 405.809 (carrier performs reconsideration, there is no right to in person participation).

HCFA. HCFA makes the reconsidered determination. 42 C.F.R. § 417.620(b).[20] HCFA contracts with Network Design Group (NDG) to make the reconsidered determination within 30 days. (Joint Statement of Facts ¶ 13.)

Notice of the reconsideration determination must be mailed to the enrollee, and if issued by the HMO, a copy of the determination must be sent to HCFA. 42 C.F.R. § 417.624. The notice must state the reasons for the reconsidered determination and inform the party that if the claim is for $100 or more, he or she has a right to a hearing before an Administrative Law Judge (ALJ).[21] *Id.*[22] The notice must describe the procedures for obtaining a hearing. *Id.*[23] A reconsidered determination is final and binding, 42 C.F.R. § 417.630,[24] unless a written request for a hearing is filed within 60 days of the date of notice of the reconsidered determination, 42 C.F.R. § 417.632.[25]

Any party to the ALJ hearing may request the Appeals Council to review the case. 42 C.F.R. § 417.634.[26] Judicial review of the Appeals Council decision may be had if the amount in controversy is $1,000 or more. 42 C.F.R. § 417.636.[27]

■ The Court finds that the Medicare statute,[28] the Secretary's regulations,[29] and the Due Process Clause of the Constitution, unequivocally provide that a Medicare benefi-

ciary is entitled to notice and hearing when an HMO denies services based on coverage determinations.

In *Gray Panthers*, the appellate court for the District of Columbia Circuit found that due process applies even to Medicare denials for claims of $100 or less and requires a "genuine opportunity" to be heard, even though the "full fair hearing" described in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), was not necessary. *Gray Panthers*, 652 F.2d at 152 n. 15, 158–59. The court defined "hearing" as "any confrontation, oral or otherwise,[30] between an affected individual and an agency decision-maker sufficient to allow the individual to present his case in a meaningful manner." *Id.* at 148 n. 3. The exact form of the hearing does not upset the core requirements of due process "—adequate notice of why the benefit is being denied and a genuine opportunity to explain why it should not be." *Id.* at 165.

In *Gray Panthers*, the court found oral hearings were required in part because of deficiencies in the notice provided to beneficiaries. The court reasoned that, at the oral hearings, beneficiaries could obtain clarification about the basis for denial and have a meaningful opportunity to respond. The court limited its opinion to the facts of the

---

**20.** *See* n. 19.

**21.** For Medicare Part A claims, under circumstances involving constitutional challenges, there is an expedited appeal process which bypasses ALJ and Appeal Council review. 42 C.F.R. § 405.718.

**22.** *Compare* 42 C.F.R. §§ 405.716, 405.811 (Part B claims for $100 are entitled to a carrier hearing; thereafter, claims of $500 or more can be appealed to an ALJ).

**23.** *Compare* 42 C.F.R. § 405.811.

**24.** *Compare* 42 C.F.R. §§ 405.717, 405.812.

**25.** *Compare* 42 C.F.R. §§ 405.717, 405.722.

**26.** *Compare* 42 C.F.R. §§ 405.724, 405.815.

**27.** *Compare* 42 C.F.R. §§ 405.730, 405.815.

**28.** HMOs "must provide meaningful procedures for hearing and resolving grievances between the

organization ... and members enrolled with the organization under [Medicare]." 42 U.S.C. § 1395mm(c)(5)(A).

**29.** "Within 60 days of receiving a request for payment for services, an HMO must give notice to an enrollee of any adverse organization determination." 42 C.F.R. § 417.608(a). The notice must state the specific reasons for the determination and inform the enrollee of his or her right to reconsideration. 42 C.F.R. § 417.608(b). When reconsidering a claim, the HMO must provide the beneficiary a reasonable opportunity to present evidence and allegations of fact or law, related to the issue in dispute, in person as well as in writing. 42 C.F.R. § 417.618.

**30.** "Paper hearings" can, depending on the total context of the entire notice and hearing process, provide an adequate opportunity to explain one's case. *Gray Panthers*, 652 F.2d at 165 (citing *Basciano v. Herkimer*, 605 F.2d 605 (2nd Cir. 1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979)).

case and conjectured that alternative procedures such as better notice might alleviate some, perhaps all, due process deficiencies. *Id.* at 148 n. 4, 166.

■ Exactly what process is owed the Medicare beneficiary by the HMO is determined by a balancing test, first established in *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976): the private interest at stake; the risk of an erroneous deprivation; the probable value of additional or substitute procedural safeguards, and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

### D. The Mathews v. Eldridge Balancing Test

#### 1. The Private Interest

In *Mathews v. Eldridge,* the Supreme Court held that an evidentiary hearing, as provided for in *Goldberg v. Kelly,*[31] was not required prior to an initial termination of disability benefits. *Eldridge,* 424 U.S. at 340–50, 96 S.Ct. at 905–10. The *Eldridge* Court distinguished the welfare benefits at stake in *Goldberg,* as an interest " 'not present in the case of … virtually anyone else whose governmental entitlements are ended—[that is,] that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits.' " *Eldridge,* 424 U.S. at 340, 96 S.Ct. at 905 (quoting *Goldberg,* 397 U.S. at 264, 90 S.Ct. at 1018). The *Eldridge* Court concluded, "Eligibility for disability benefits, in contrast, is not based upon financial need." *Id.*

The Court, nonetheless, recognized that the degree of distinction could be easily overstated because a disability recipient is by definition, "unable to engage in substantial gainful activity" and correspondingly will usually be in a precarious economic position. *Id.* at 342, 96 S.Ct. at 588–89. The Court, however, found that there was less reason

than in *Goldberg* to require a full blown hearing because any temporary loss in disability benefits could possibly be offset by access to private financial resources or if not, other governmental, such as state, welfare subsidy programs could temporarily replace the lost disability benefit. *Id.*

Finally, the Court considered the "possible length of wrongful deprivation of benefits" as an important factor in assessing the impact on the private interest at stake. *Id.* at 341–42, 96 S.Ct. at 905–06. In *Eldridge,* the time between an initial determination of ineligibility for disability benefits and a final determination exceeded one year. *Id.* But then, wrongfully withheld benefits could be retroactively recovered. *See Eldridge,* 424 U.S. at 340, 96 S.Ct. at 905 (full retroactive relief confines the claimant's interest to the uninterrupted receipt of benefits).

The private interest at stake from an initial denial of Medicare coverage "should be weighed more heavily than in *Eldridge* because of the astronomical nature of medical costs." *Kraemer v. Heckler,* 737 F.2d 214, 222 (2nd Cir.1984). The Second Circuit assessed the time between an adverse Utilization Review Committee (URC) decision which triggered termination of benefits and the agency's affirmation of the termination which triggered appeal rights and concluded that the approximately three-week period could financially cripple all but the very wealthy. The court held that because the potential for personal liability for medical costs would most likely cause a patient to discontinue receiving medical care, due process attaches to URC denial decisions. *Id.*

The *Kraemer* court distinguished the procedures available to the recipient facing termination of Medicare benefits by the URC and those available in *Eldridge.* In *Eldridge,* the plaintiff asked for an evidentiary hearing or oral presentation prior to the initial termination of disability benefits. The Secretary had already provided: notification

---

**31.** The pretermination due process rights of *Goldberg,* rejected by the Court in *Eldridge,* are: 1) timely and adequate notice of the reasons for termination; 2) an effective opportunity to defend a claim by confronting adverse witnesses and by presenting the case, including evidence, orally; 3) retained counsel, if desired; 4) an impartial decisionmaker; 5) a decision based on the law and evidence adduced at the hearing; and 6) a statement of reasons for the decision and the evidence relied on. *Goldberg,* 397 U.S. at 266–71, 90 S.Ct. at 1019–22.

of the tentative assessment and reasons for the denial, including a summary of the evidence; the beneficiary had access to all the information being considered by the agency and had an opportunity to make written submissions, with the assistance of a treating physician to rebut the agency's information and tentative conclusion. In *Kraemer*, no procedural process was afforded the beneficiary prior to URC termination of benefits. *See also: Vorster v. Bowen,* 709 F.Supp. at 946 (disproportionate number of Medicare recipients live near the poverty level; in combination with the astronomical cost of medical care, there is a substantial interest in obtaining reimbursement for medical bills already paid); *Fox v. Bowen,* 656 F.Supp. at 1249–50 (private interest in receiving Medicare coverage for physical therapy; due process attaches to coverage denials which terminate receipt of physical therapy). *But see Himmler v. Califano,* 611 F.2d at 146 (post-denial notice and hearing via administrative appeal sufficient due process because no substantial deprivation; medical services are already received so the only issue is ultimate financial liability).

Here, the Court finds that Plaintiffs have a greater interest in Medicare benefits than the disability benefits assessed in *Eldridge,* especially because they are HMO enrollees. The HMO's initial adverse coverage determination in many cases prevents receipt of medical care. Unlike *Eldridge,* the deprivation suffered from an HMO denial to provide care cannot so easily be remedied by retroactive recoupment of benefits. When Medicare services are denied, they are often foregone and, depending on the medical condition, final adjudication may come too late to rectify the situation, especially if the deprivation contributed to or resulted in unnecessary pain and suffering or death. (*See* Volume I

Plaintiffs' Declarations: Exhibit A in Support of Motion for Summary Judgment.) [32]

▮ The Court is aware that many HMO denials involve emergency or urgent care services which occur after delivery of service and address only whether the patient is the financially liable party. This was the issue in *Gray Panthers* and *Vorster v. Bowen.* The Court finds the reasoning in *Gray Panthers* and *Vorster* persuasive and finds that in all instances, Medicare beneficiaries have a substantial interest in receiving timely services or timely payment for care already received.

### 2. The Risk of an Erroneous Deprivation through the Procedures Used

In 1993 and 1994, the rate of appeals from fee-for-service denials were respectively, 27 and 31 times higher than appeals from HMO denials. (Joint Statement of Facts at ¶ 15.) [33] Defendant argues that this evinces the great job being performed by HMOs. The Court concludes otherwise.

Plaintiffs reviewed 570 HMO adverse notices and report:

1. *Readability:* 52% of the notices reviewed were illegible, based primarily on criteria of 12–point type as the recognized minimum print size for readability by elderly persons.

2. *Reason for Denial:* 74% of the notices provided vague, ambiguous, nonspecific reasons for denial.

3. *Personal Liability:* only 41% contained an explanation of personal liability resulting from care incurred subsequent to denial.

4. *Appeal Rights:* vast majority of the notices provided information on appeal rights. Ninety-six percent of the notices included the time frame for ap-

---

32. The Court shall not repeat the sad case histories of the Plaintiffs, but this exclusion in no way makes their stories any less heart breaking. The Court finds that in each Plaintiffs' case the denial of Medicare services worked a substantial and painful deprivation upon the beneficiary.

33. For purposes of Plaintiffs' Motion for Summary Judgment, the Court assumes timeliness at all stages of the appeal process. The record reflects rampant timeliness problems, but Defendants submit any time problems have been re-

cently resolved and that HMOs and NDG are now complying with regulatory deadlines. (Joint Statement of Facts at ¶ 16.) The Court believes strict compliance is mandatory, especially in light of the severe hardship which can be worked by a Medicare service denial and the fact that there is no expedited appeal mechanism for acute medical care decisions. Hospital discharges are the only services subject to immediate appeal by Peer Review Organizations (PROs). 42 C.F.R. § 417.605.

peal; 91% directed claimants on where or with whom to file the appeal; 73% explained that additional evidence could be provided; only 10% provided information about Peer Review Organization (PRO) [34] review.

(Volume III Plaintiffs' Exhibit C in Support of Motion for Summary Judgment at 2.)

The Court additionally reviewed the denial notices it found sprinkled throughout the 44 declarations of party Plaintiffs. (See Volume I Plaintiffs' Declarations Exhibit A in Support of Motion for Summary Judgment at 2, 9, 10, 13, 20, 23, 30, 33, 38, and 42.) [35] Of these ten examples, six were issued in 1995, two in 1994, one in 1993, and one in 1992. The Court found the notices failed to provide adequate reasons for the denials. Not one notice provided the specific basis for coverage denial; the notices only included explanations like, "beneficiary no longer receiving "skilled nursing care" and therefore, based on the HMO's "understanding of Medicare coverage policies," the HMO would not continue to provide the care after some date certain—usually two days from the day the letter was written. This does not inform the beneficiary of the factual basis for the denial, nor enlighten him or her as to what specific service is not covered and why. Without proper notice, the claimant must guess at what evidence to submit for reconsideration of the claim. *Gray Panthers,* 652 F.2d at 168.

The notice format used by the HMOs hides the ball. For example, the notices reviewed by the Court were primarily denials for Skilled Nursing Facility (SNF) care and they all failed to include important coverage information:

Coverage for care provided in a skilled nursing facility exists, if one of three criteria are met: 1) the patient requires skilled nursing services or skilled rehabilitation services, i.e., the care is being furnished by or under the supervision of professional or technical personnel; 2) the patient requires these skilled services on a daily basis; and 3) as a practical matter, considering economy and efficiency, the daily skilled services can be provided only on an inpatient basis in a Skilled Nursing Facility (SNF). The services must also be furnished pursuant to a physician's orders and be medically necessary.

Health Care Financing Administration Manual at § 3132.

A denial of coverage because a SNF is providing custodial, nonskilled, nursing care should identify which noncoverage factor(s) applies. Custodial care criteria is set forth in another section of the Health Care Financing Administration Manual, § 3159. Reference to this section would also assist claimants in forming appeal arguments.

Without this type of notice, a claimant cannot begin to fathom what additional evidence to present to rebut the denial. *Gray Panthers,* 652 F.2d at 168; *Vorster v. Bowen,* 709 F.Supp. at 946–47. "Congress, in enacting and amending Medicare, has repeatedly recognized that the elderly, as a group, are less able than the general populace to deal effectively with legal notices and written registration requirements—... 'due to inattention or inability to manage their affairs.'" *Gray Panthers,* 652 F.2d at 169 (quoting S.Rep. No. 1230, 92d Cong., 2d Sess. 38 (1972)). "To countenance granting them less than adequate notice of the reasons for denial of medical benefits would be inconsistent with the Congressional intent, to say the least." *Id.* at 169.

In 25% of the notices reviewed by Plaintiffs, or in eight of the ten reviewed by the Court, the HMO failed to inform the claimant that he or she had a right to present additional evidence to the HMO for reconsideration. This omission violates 42 C.F.R. § 417.618. All the notices fail to direct claimants to their attending physicians as a primary means for obtaining substantiating evidence of medical necessity to rebut a denial. HMOs ignore that the managed care

---

**34.** PROs are independent organizations of health care professionals which by law HCFA must contract with to review the quality of care given to Medicare beneficiaries. (Joint Statement of Facts at ¶ 35); 42 U.S.C. § 1395mm(i)(1). Congress mandated funding for PRO review activities. 42 U.S.C. § 1395mm(i)(7)(B) and (C).

**35.** The Court finds that these are not isolated cases. *See* same Exhibit at 11, 19, 27, 29, 35, 37, and 41 (supporting affidavits of various client advocacy groups).

system has made strange bed-fellows of provider doctors who in the fee-for-service system provided patient advocacy for many claim denials. *See Kraemer,* 737 F.2d at 222 (URC only notifies physician to appear in advocacy of patient and there are "built-in" incentives for them not to). At best, HMO policies and procedures ignore the void; at worst, policies and procedures, such as "gag rule" contract provisions, eliminate this key evidentiary source.

Defendant argues that the HMO considers the claimant's medical records on reconsideration, but without additional evidence from the treating physician regarding medical necessity, HMO reconsideration approximates a "rubber stamp" of the initial denial. This has grave consequences because an HMO denial may mean the enrollee will go without medically necessary service. Given the length of time it takes for further appeal of the HMO denial, deprivations will certainly have significant impacts on quality of life and some may even be life threatening.

Due process requires a meaningful opportunity to present one's case at a meaningful time. *Gray Panthers,* 652 F.2d at 164. The statute and regulations reflect this standard. 42 U.S.C. § 1395mm(c)(4) requires that an "HMO must provide meaningful procedures for hearing and resolving grievances...." 42 C.F.R. § 417.618 requires that an "HMO must provide parties to the reconsideration reasonable opportunity to present evidence and allegations of fact or law, related to the issue in dispute, in person as well as in writing." Some HMOs enact these provisions by allowing the request for reconsideration to be filed with the HMO in person. Even where the HMO informs a claimant that evidence can be provided in person, the notices fail to describe any procedures for securing an in-person communication with the HMO person reconsidering the claim. *See Gray Panthers,* 652 F.2d at 157 (a phone number on the notice doesn't mean the claimant has an opportunity to speak directly to the decisionmaker; value of informal hearing is the ability to talk directly to the decisionmaker). The Court is not aware of any HMO providing any type of in-person communications, such as informal hearings.

The statutes and regulations also provide for direct appeal of quality of service complaints to PROs. 42 U.S.C. § 1395mm(i)(7). The HMO must have an outreach program designed to apprise enrollees of the peer review system, its purpose, and the method for securing PRO review. 42 U.S.C. § 1320c–3(a)(4)(B). Quality of service includes under-utilization and continuity of care issues. *Id.* Both could arise within the context of a service denial. For this reason, notices should, but routinely do not, include any reference to the PRO appeal process.

■ The Court finds that existing reconsideration procedures followed by HMOs fail to secure minimum due process for Medicare beneficiaries. Notice and informal hearing requirements set forth by statute and regulations are all but ignored. The existing system fails to provide "a meaningful opportunity" to present the claim "at a meaningful time." Subsequent due process, available in the administrative review phase of the appeal, comes too late in many cases: assuming no delay by claimant, the HMO has 60 days to make the reconsideration decision; HCFA/NDG has 30 days to decide reconsiderations not granted by the HMO; [36] if the claim is for less than $100 there is no further due process; if the claim is for $100 or more, the matter can be appealed to an ALJ. In 1994, ALJ review took approximately 250 days. (Joint Statement of Facts at ¶ 17.) This Court, as did the court in *Gray Panthers,* concludes:

> Current procedures allotted to the elderly Medicare claimant, probably disadvantaged by disability and poverty, resemble playing against a stacked deck—... [and result] in a significant possibility of deprivation.

*Gray Panthers,* 652 F.2d at 172.

3. *The Government's Interest, Including the Fiscal and Administrative Burdens that the Additional or Substitute Procedural Requirements Would Entail*

■ The alternative procedural safeguards discussed by this Court entail no greater

---

36. Settlement agreement in class action law suit, *Levy v. Sullivan,* No. 88–3271, 1989 WL 265476 (C.D.Cal. March 14, 1989); (Medicare & Medicaid Guide ¶ 37,809 at 19,748).

fiscal and administrative burdens for Defendant than that contemplated by Congress and provided for by applicable law and regulation.[37] A more meaningful appeal process by the HMO may actually reduce fiscal burdens on the federal government because improper denials by HMOs cause Medicare beneficiaries to return to fee-for-service providers at greater expense to the government. In conclusion, the burden of proper notice and an opportunity to be heard on reconsideration by the HMO does not outweigh the substantial interest at stake and the risk of erroneous deprivation posed by the existing procedures.

*E. Relief: Judicial Authority to Order the Secretary of Health and Human Services to Enforce Regulatory and Statutory Provisions of 42 U.S.C. § 1395mm*

*1. Enforcement Decisions are Generally Committed to Agency Discretion*

■ Defendant argues that there can be no judicial review of the Secretary's enforcement activities, or lack thereof.

Review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion . . .—if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for "abuse of discretion."

*Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). Under *Heckler v. Chaney*, refusal to take enforcement action by an administrative agency is presumptively nonreviewable. *Id.* (citing Administrative Procedure Act (APA); 5 U.S.C. § 701(a)(1) and (a)(2)). The presumption, however, can be overcome where the statute provides guidelines for the agency to follow for then there is law to apply. *Id.*

The statute discussed in *Chaney* was a general provision: "the Secretary is authorized to conduct examinations and investiga-

tions. . . ." *Id.* at 835, 105 S.Ct. at 1657. The Court described this language as permissive compared to language it had identified in *Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), as mandatory: "the Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation . . . has occurred . . . he shall . . . bring a civil action. . . ." *Id.* at 833, 105 S.Ct. at 1657. In the latter, there is law to apply; in the former, a refusal to institute proceedings is a decision "committed to agency discretion by law." *Id.* at 834–35, 105 S.Ct. at 1657. (quoting APA § 701(a)(2)).

■ The statutory provisions at issue in this case are contained in 42 U.S.C. § 1395mm(c) which provides:

(1) The Secretary *may not* enter into a contract under this section with an eligible organization unless it meets the requirements of this subsection . . .

Subsections 4–6 address service and continuity of care standards, notice and hearing procedures, and appeal rights held by Medicare recipients. The Court finds that Congress expressly prohibits the Secretary from entering into arrangements with HMOs which fail to meet these requirements. *Cf. Barron v. Reich*, 13 F.3d 1370, 1375 (9th Cir.1994) ("shall" or "shall not" reflect mandatory duties; "may" describes a permissive function). As evident from the Court's analysis in the prior sections of this Order, the provisions and requirements of 42 U.S.C. § 1395mm(c) provide an ample basis in law to apply to the facts of this case.

■ The Court finds that the Secretary violates 42 U.S.C. § 1395mm(c)(1) by entering into a contract with any HMO that fails to meet the following notice requirements:

Notice:

1. Shall always be given for any and all denials of service;

2. Shall be timely;

---

37. The Court finds no statutory basis for Plaintiffs' proposal that appellate review place the burden of proof on the HMO and the HMO carries the burden on reconsideration before the NDG. (Joint Statement of Facts at ¶ 14.) Con-

gress placed the burden on the claimant to establish eligibility, *Ward v. Schweiker*, 686 F.2d 762, 765 (9th Cir.1982), and this Court is not inclined to disrupt this chosen balance.

3. Shall be readable: at least 12–point type;

4. Shall state the reason for denial clearly and in such terms as to enable the enrollee to argue his or her case;

5. Shall inform the enrollee of all appeal rights, including PRO review;

6. Shall inform the enrollee of the right to a hearing on reconsideration and that additional evidence may be presented, in person, and shall explain the procedure for securing an informal hearing, and

7. Shall provide instruction on how to obtain supporting evidence, including medical records and supporting affidavits from the attending physician. The HMO must abolish any policy or procedure which would impede such advocacy.

■ The Court finds that the Secretary violates 42 U.S.C. § 1395mm(c)(1) by entering into a contract with any HMO that fails to meet the following hearing requirements:

Hearing:

1. Shall be informal, in-person communication with the decisionmaker;

2. Shall be available upon request for all service denials, and

3. Shall be timely according to the seriousness of the medical condition implicated by the denied service:

Immediate hearing shall be available for acute care service denials, specifically where delivery of the service is prevented by the denial. (Assuming the HMO's reconsideration decision will be correspondingly expeditious, the appeal to NDG will be expedited for these cases). All other hearings can be within the normal . course of the HMO's 60–day time frame for reconsideration, especially for more routine, nonacute medical care decisions or when care has been rendered and financial liability remains as the only issue.

*2. Abuse of Discretion*

■ An example of the Secretary's discretionary enforcement power appears in 42 U.S.C. § 1395mm(i)(1) which provides that she may terminate a contract prior to its expiration, upon finding that the HMO substantially fails to meet certain conditions, including those at issue here. Additionally, if she determines there is substantial noncompliance, she may impose civil monetary fines, suspend enrollment, or prevent an HMO from expanding its service area. 42 U.S.C. § 1395mm(i)(6).

Here, the Court reviews for abuse of discretion. *Heckler v. Chaney,* 470 U.S. at 833 n. 4, 105 S.Ct. at 1656 n. 4 (consciously and expressly adopted policy that is so extreme as to be an abdication of statutory responsibility is an abuse of discretion). Has the Secretary wholly abdicated her enforcement responsibilities? Is her policy of "continual improvement," so extreme as to undermine the fundamental statutory scheme that the Secretary be empowered to ensure that HMOs provide an effective and efficient medical delivery system to Medicare beneficiaries?

Plaintiffs urge the affirmative and proffer evidence that the Secretary fails to collect service utilization data; has a policy of encouraging voluntary improvement rather than penalizing HMOs; fails to use PROs to effectively review underservicing, and fails to implement a beneficiary complaint system. The Secretary admits to problems with the HMO delivery system, but counters that under her tutelage, the HMOs have continually *improved* and many of Plaintiffs' complaints have been corrected. The Court finds that there are material facts in dispute as to the effectiveness of the Secretary's monitoring and her enforcement choices. Summary judgment is not appropriate to determine whether she has abused her discretion.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is DENIED.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment is GRANTED in part and DENIED in part.

**IT IS FURTHER ORDERED** that within 20 days of the filing date of this Order the Plaintiff shall file a proposed form of judg-

ment in accordance with the findings of this Court; Defendant shall respond.

**IT IS FURTHER ORDERED** that if the procedural changes resulting from this Order do not rectify delivery of care and quality of service issues, the Court retains jurisdiction over this case to reconsider the issue of the Secretary's discretionary enforcement duties and to refer the matter to a special master pursuant to Federal Rule of Civil Procedure 53.